UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

PHILLIP AVERY SCALES,

                Plaintiff,

v.                                                    Case No. 19-cv-1360-pp

C.O. PATRICK NOONAN,
C.O. SAULYS, C.O. THOMPSON,
C.O. GIBBS, CITY OF RACINE,
NURSE AMANDA, SARA JEGGLER,
DEPUTY BURTARDT, and C.O. KNEGT,

                Defendants.

**ORDER GRANTING PLAINTIFF'S MOTION TO PROCEED WITHOUT PREPAYING FILING FEE (DKT. NO. 2), DENYING MOTION TO APPOINT COUNSEL (DKT. NO. 6), DENYING AS MOOT MOTION TO WAIVE INITIAL PARTIAL FILING FEE (DKT. NO. 11) AND SCREENING COMPLAINT**

      Plaintiff Phillip Avery Scales, representing himself, filed a complaint alleging that the defendants violated his civil rights under 42 U.S.C. §1983 when the defendants were deliberately indifferent to the plaintiff's medical needs in failing to address his dislocated shoulder while he was an inmate at the Racine County Jail.[1] Dkt. No. 1. He has also filed a motion to proceed without prepayment of the filing fee (Dkt. No. 2), a motion to appoint counsel (Dkt. No. 6) and a motion to waive the initial partial filing fee (Dkt. No. 11). This order resolves those motions and screens the complaint.

---

[1] The court received *two* complaints from the plaintiff on the same day, and both named Patrick Noonan as one of the defendants. Not realizing that the documents were meant to be two separate lawsuits, the clerk's office first stamped all the documents with the number for this case. Once it realized that one document named defendants that the other did not, the clerk's office re-filed the second complaint as Case Number 19-cv-1382-pp.

**I.    Motion to Proceed Without Prepaying the Filing Fee (Dkt. No. 6) and Motion to Waive Initial Partial Filing Fee (Dkt. No. 11)**

The Prison Litigation Reform Act applies to this case because the plaintiff was incarcerated at the Racine County Jail at the time he filed the complaint. 28 U.S.C. §1915. The PLRA allows a court to let an incarcerated plaintiff proceed with his case without prepaying the filing fee if he meets certain conditions. One of those conditions is that the plaintiff must pay an initial partial filing fee. 28 U.S.C. §1915(b). Once the plaintiff pays the initial partial filing fee, the court may allow the plaintiff to pay the balance of the $350 filing fee over time, through deductions from his prisoner account. Id.

On September 23, 2019, the court ordered the plaintiff to pay an initial partial filing fee of $6.75 by October 14, 2019. Dkt. No. 5. On September 30, 2019, the court received from the plaintiff a motion to waive the initial partial filing fee. Dkt. No. 11. Then, on October 4, 2019, the court received the initial partial filing fee. The court will grant the plaintiff's motion for leave to proceed without prepaying the filing fee. The plaintiff must pay the $336 balance of the filing fee as he is able. Because the plaintiff has paid the initial partial filing fee, the court will deny his motion to waive the initial partial filing fee as moot.

**II.    Screening the Complaint**

   A.    Federal Screening Standard

Under the Prison Litigation Reform Act, the court must screen complaints brought by prisoners seeking relief from a governmental entity or officer or employee of a governmental entity. 28 U.S.C. §1915A(a). The court must dismiss a complaint if the prisoner raises claims that are legally "frivolous or malicious," that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from

3

such relief. 28 U.S.C. §1915A(b).

In determining whether the complaint states a claim, the court applies the same standard that it applies when considering whether to dismiss a case under Federal Rule of Civil Procedure 12(b)(6). See Cesal v. Moats, 851 F.3d 714, 720 (7th Cir. 2017) (citing Booker-El v. Superintendent, Ind. State Prison, 668 F.3d 896, 899 (7th Cir. 2012)). To state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must contain enough facts, accepted as true, to "state a claim for relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows a court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556).

To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)). The court liberally construes complaints filed by plaintiffs who are representing themselves and holds such complaints to a less stringent standard than pleadings drafted by lawyers. Cesal, 851 F.3d at 720 (citing Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015)).

B.  Allegations in the Complaint

The plaintiff alleges that between 9:00 p.m. on July 23 and 7:00 a.m. on July 24—he does not say what year—his shoulder was dislocated. Dkt. No. 1 at

4

2. The plaintiff says that he pushed the emergency button in his cell immediately, but that it took defendant C.O. Gibbs "about an hour to respond." Id. The plaintiff asserted that he told Gibbs that his shoulder was dislocated, that Gibbs "came and checked and notified the nurse Amanda as well as Nicole." Id. The plaintiff says that it took them "at least another hour to respond." Id. He says that when they did respond, they "assessed" him in the hallway and that it was clear that his shoulder was dislocated. Id. The plaintiff asserts that "'she' avoided stating it on purpose on Gibbs body camera." Id. He indicates that "they" took his vitals, then put him back in his cell "w/o putting [him] on the immediate path to recovery which isn't policy." Id.

The plaintiff averred that after about another hour, Gibbs, C.O. Thompson and C.O. Saulys came to his cell and he told them that his shoulder was dislocated and hurting; he asked "where was medical." Id. The plaintiff asserted Thompson responded that he knew and that they were there to take the plaintiff down to see medical. Id. The plaintiff averred, however, that instead of taking him to the nurse's office or the hospital, they put him in an intake cell "which isn't policy or procedure for a person w/ a dislocated shoulder." Id. He alleged that "they" did not give him any pain medication or an ice pack nor did they get him medical attention. Id. at 3.

The plaintiff said that on the way to the intake cell, C.O. Patrick Noonan, with whom he'd had prior incidents, along with "about" two other C.O.s forcefully put him into the cell and tried to force him to lay down on the bunk "amidst [the plaintiff's] protests of [his] arm being dislocated." Id. The plaintiff explained that he couldn't lay down due to "bone on bone contact causing excruciating pain," so Noonan and the other C.O.s grabbed him, forcing him onto the bed. Id. The plaintiff said that he "started to fall back and drop directly

5

to the floor due to the pain while telling them [he] was passing out." Id. The plaintiff said "they" still grabbed him and pushed him onto the bed, hitting his head, and "smacking [his] face directly onto the mat and arm twisting [his] body with [him] laying on it awkwardly." Id. The plaintiff claimed he "was screaming from the torturous acts they just did asking them why did they just do that." Id.

The plaintiff asserted that "they" left, and that he started pushing the emergency button he couldn't move his arm, fingers and hand, and because the pain "had increased tenfold and was starting to numb." Id. The plaintiff alleged that he banged on the door as much as he could, and that he couldn't feel his arm, hands and fingers as "the[y] swelled almost double their size and started discoloring a paleish color." Id. The plaintiff indicated that eventually he passed out, "either before or after [he saw] Nurse Amanda again." Id.

The plaintiff alleged that he saw Nurse Amanda again and that she "admitted on camera that she knew [his] shoulder was dislocated" and said that Sara Jeggler told her to put the plaintiff in the intake cell, "which isn't policy." Id. The plaintiff asserted that "everything is on body cameras and intake cameras." Id.

The plaintiff stated that he woke up to C.O. Knegt, Nurse Amanda and LPN Nicole (not a defendant). Id. He asserted that he couldn't talk "from being incoherent" and because the pain was so great. He alleged that they "just left me on the floor where they found me passed out." Id.

The plaintiff asserted that at what he believed was around 3:00 a.m., which the plaintiff noted was over five hours after he dislocated his shoulder, defendant Deputy Burtardt and Deputy Theisen (not a defendant) took him to the hospital. Id. He asserted that "Deputy" forced him to cuff his dislocated

6

arm to his waist with "belly chains which isn't policy or procedure," and that this hurt even more. Id. The plaintiff alleged that at the hospital, "he was being very disrespectful and making [the plaintiff's] pain worse and making [the plaintiff] suffer more." Id. The plaintiff alleged that on the way to x-ray, "he asked" the plaintiff if the plaintiff still needed his ice pack; the plaintiff responded, "of course," but "he" still threw it away. Id. The plaintiff alleged that when he got back to the room and asked for the ice pack, "he said he didn't know where he set it so [the plaintiff] told him is he going to find it or get [the plaintiff] a new one and he refused." Id. The plaintiff asserted that eventually, he had to be "put to sleep and shot with needles (multiple) of fentanyl to put [his] shoulder back and need surgery." Id. The plaintiff alleged something about getting a different prescription than what the hospital recommended but that portion of the complaint is illegible. Id. at 3-4. He alleged that someone asked him if he could move "it" and said it was very swollen and asked if they x-rayed it at the hospital; the plaintiff told "him" that the plaintiff didn't know. Id. at 4.

For relief, the plaintiff asked to be "heavily compensated financially." Id. at 5.

### C. Analysis

The plaintiff asserts that the defendants violated his Constitutional rights in the way they dealt with the dislocated shoulder. The plaintiff did not explain whether he was a pre-trial detainee or a convicted prisoner at the time of these events. Given the plaintiff's allegations, the court will apply the Eighth Amendment standard because the Seventh Circuit has held that "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." Lewis v. Downey, 581 F.3d 467, 475 (7th Cir. 2009).

"The Eighth Amendment safeguards the prisoner against a lack of

7

medical care that 'may result in pain and suffering which no one suggests would serve any penological purpose.'" Arnett v. Webster, 658 F.3d 742, 750 (7th Cir. 2011) (quoting Rodriguez v. Plymouth Ambulance Serv., 577F.3d 816, 828 (7th Cir. 2009); Estelle v. Gamble, 429 U.S. 97, 103 (1976)). "Prison officials violate the Constitution if they are deliberately indifferent to prisoners' serious medical needs." Id. (citing Estelle, 429 U.S. at 104). A plaintiff claiming that prison officials were deliberately indifferent to his serious medical needs "must demonstrate two elements: 1) an objectively serious medical condition; and 2) an official's deliberate indifference to that condition." Id. (citing Johnson v. Synder, 444 F.3d 579, 584 (7th Cir. 2006); Roe v. Elyea, 631 F.2d 843, 857 (7th Cir. 2011)).

"A 'serious medical need' is a condition that a doctor has recognized as needing treatment, or a condition so obvious that even a lay person would recognize the need for medical treatment." Schmidt v. Bowens, No. 16-cv-30-slc, 2018 WL 708391 at *2 (W.D. Wis. 2018) (quoting Johnson, 444 F.3d at 584-85).

> A medical need may be serious if (1) it is life-threatening, carries risks of permanent serious impairment if left untreated or results in needless pain and suffering, *Guttierez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997); or (2) it "significantly affects an individual's daily activities," *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998); or (3) it otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer [v. Brennan]*, 511 U.S. [825] at 847 [(1994)].

Id. For the purposes of screening, the court will assume that a dislocated shoulder—a very painful condition that could become worse if left untreated—constitutes a serious medical condition.

Turning to whether the defendants were deliberately indifferent to that condition, the plaintiff must state sufficient facts to show that the defendants

8

knew about the dislocated shoulder and the risk it posed and that they disregarded or ignored that risk. Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014). The plaintiff has sufficiently alleged at this stage that defendants Gibbs, Nurse Amanda, Thompson, Saulys, Jeggler, Knegt and Burtardt knew that his shoulder was dislocated. He has alleged that after he told Gibbs about the dislocated shoulder, it took Nurse Amanda at least an hour to respond, and that she refused to acknowledge the dislocation and had him put back in his cell. He has alleged that Gibbs, Thomson and Sylas, despite being aware of the dislocation, didn't take him to the nurse or to the hospital, but took him to an intake cell. He alleges that on the way to the cell, Noonan and two others exerted physical force despite the plaintiff telling them of the pain they were causing. He has alleged that Noonan and the others left him in a cell with no response to his pushing the emergency button or banging on the door, and that he eventually passed out. He has alleged that when he came to, Knegt and Amanda just left him in the cell with no help or treatment, and that Jeggler told Amanda that he should be put in the cell. He has alleged that after waiting five hours, he was taken to the hospital by Burtardt and Thiesen and that one of them (the court assumes it was Burtardt, because the plaintiff did not name Thiesen as a defendant) deprived him of his ice pack despite him indicating that he needed it.

Whether the the Eighth Amendment deliberate indifference to medical needs standard or the Fourteenth Amendment objective unreasonableness standard will apply when the time comes to decide whether the plaintiff's claims have merit will depend on whether he was a pretrial detainee or a convicted prisoner. For now, at the screening stage, the court need not make that determination, since the plaintiff has stated claims against these

9

defendants under either standard. Although the plaintiff did not name LPN Nicole as a defendant, he has alleged that it took her over an hour to respond and that she, too, left him in the cell with no help after he came to. The court will instruct the clerk to change the caption to add LPN Nicole as a defendant, and the plaintiff may proceed against her on either a Fourteenth or Eighth Amendment claim.

The plaintiff alleged that defendant Patrick Noonan and two unnamed defendants used excessive force when moving him into the intake cell. Because the court does not know whether the plaintiff was a pretrial detainee or a convicted prisoner, the court will use the Eighth Amendment excessive force standard, because if the plaintiff's allegations satisfy the Eighth Amendment standard, they also will satisfy the Fourteenth Amendment standard. Lewis, 581 F.3d at 475.

The Eighth Amendment prohibits "the wanton infliction of pain." Mitchell v. Krueger, 594 Fed. Appx. 874, 876 (7th Cir. 2014). In excessive force cases, prison officials are liable only where the "force was used sadistically for the very purpose of causing harm." Id. The plaintiff alleged that Noonan and the unnamed officers grabbed him, pushed him onto the bed so that he hit his head and smacked his face into the mat with his arm twisting under his body; he alleged that he was screaming and asked them why they did this, but they just left him in pain. Dkt. No. 1 at 3. At this stage, the plaintiff has stated sufficient facts to allow him to proceed on a claim that Noonan and the two unnamed officers wantonly inflicted pain on the plaintiff, violating the constitutional prohibition on the use of excessive force.

The court will instruct the clerk to add the two unnamed officers to the caption as John Doe 1 and John Doe 2. After the named defendants have

answered the complaint, as explained below, the plaintiff will need to make discovery requests on the named defendants to identify the real names of the John Doe correctional officers. Once the named defendants answer the complaint, the court will issue a scheduling order, which will provide more information about identifying the John Does.

The plaintiff also named the City of Racine as a defendant, but the complaint makes no allegations against the city. Section 1983 "creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional violation." Hildebrant v. Ill. Dep't. of Nat. Res., 347 F.3d 1014, 1039 (7th Cir. 2003) (quoting Vance v. Peters, 97 F.3d 987, 991 (7th Cir. 1996)). Because §1983 makes public employees liable "for their own misdeeds but not for anyone else's," Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir.2009), a plaintiff must specifically allege what each individual defendant did (or did not do) to violate his constitutional rights; the plaintiff has not done that with regard to the city.

Further, §1983 allows a plaintiff to sue a "person" who, acting under the color of law, violates his constitutional rights. The City of Racine is not a person. There are some circumstances where a municipality can be sued under §1983, see Monell v. Dept. of Social Servs. of City of New York, 436 U.S. 658 (1978), including where the plaintiff alleges that "his injury was the result of the municipality's or corporation's official policy or custom," Rice v. Correctional Medical Services, 675 F.3d 650, 675 (7th Cir. 2012). The plaintiff has not identified any policy or custom of the city of Racine that violated his constitutional rights. The court will dismiss the City of Racine as a defendant.

11

### III. Motion to Appoint Counsel (Dkt. No. 6)

The court received from the plaintiff a letter which covered several issues. Dkt. No. 6. One of the things the plaintiff said in the letter was that he was "really trying to find a lawyer as best [he could] but it would be better if [the court] could please assign [him] one. Can you?" Id. at 1. He asked for a copy of the Federal Rules of Civil Procedure and a copy of the local rules, and stated that he didn't know how to file motions to extend deadlines. Id. He stated that he didn't intend to miss any deadlines, but that was why he'd like a lawyer "asap, just in case, I figure the sooner the better." Id. The court construes this letter as a motion to appoint counsel.

In a civil case, the court has the discretion to recruit counsel for individuals unable to afford counsel. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1); Ray v. Wexford Health Sources, Inc., 706 F.3d 864, 866-67 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)).

In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" Pennewell v. Parish et al., 923 F.3d 486, 490 (7th Cir. 2019), (quoting Pruitt v. Mote, 503 F.3d 647, 653 (7th Cir. 2007)). To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Auth., 930 F.3d 869, 871 (7th Cir. 2019). To do so, the plaintiff must show he

12

contacted at least three lawyers and provide the court with (1) the lawyers' names; (2) their addresses; (3) how and when the plaintiff attempted to contact the lawyer; and (4) the lawyers' responses.

In particular, the lawyers' responses may have bearing on the court's decision to exercise its discretion because they may shed light on whether the plaintiff's attempts to hire counsel were reasonable. Pickett, 930 F.3d at 871. In deciding whether to recruit counsel, the court should consider the reasons the lawyer declined representation, including whether the plaintiff was unwilling (as opposed to unable) to pay a retainer; whether the lawyer lacked the time or capacity to take on new clients; or whether the subject matter of the case requires a lawyer who specializes in a specific area of law. Id. The court should also consider how well the plaintiff articulated his case to the prospective lawyer. Id. Where a plaintiff "conveyed his situation well and counsel deemed the claim feeble, then it would be inappropriate for a court to intervene" and recruit counsel. Id. But, where a plaintiff is inarticulate, then a court "may have a useful role to play in recruiting counsel." Id.

When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." Pennewell, 923 F.3d at 490. The court looks at "whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 490-491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual capacity, psychological history, physical limitations and any other

13

characteristics that may limit the plaintiff's ability to litigate the case." Id. at 491. In situations where the plaintiff files his motion in the early stages of the case, the court may determine that it is "impossible to tell whether [the plaintiff] could represent himself adequately." Pickett, 930 F.3d at 871.

The plaintiff attached to his motion five Inmate Request/Complaint forms, dated between September 16 and September 18, 2019. Dkt. No. 6-1. It is not clear to whom he sent these requests—usually an inmate request form goes to the jail staff. The language of some of the forms implies that the plaintiff may have thought he was sending these forms to lawyers, including several members of the state public defender's office and one civil lawyer. Id.

The court acknowledges that the plaintiff tried to find a lawyer. He should have written letters directly to the lawyers, rather than asking the jail to forward the requests. Further, public defenders can represent only defendants charged in criminal cases. They cannot represent civil plaintiffs. There is no civil equivalent of the public defender's office for plaintiffs with no money who want to file civil cases.

Even if the plaintiff had written directly to three or more civil lawyers asking them to represent him, the court would not grant his request to appoint him a lawyer at this stage. The plaintiff says he wants a lawyer so that he can comply with the Federal Rules of Civil Procedure, the Civil Local Rules and the deadlines the court may set. The clerk's office sent the plaintiff a copy of the Local Rules and a copy of the court's Frequently Asked Questions pamphlet in response to the plaintiff's request in Scales v. Noonan, Case No. 19-cv-1382 (Dkt. No. 7). The court cannot send a copy of the Federal Rules of Civil Procedure to every incarcerated plaintiff—the rule book is large, heavy and expensive.

14

If the plaintiff needs more time to do something, he needs only to write to the court, *before* the deadline for doing whatever he is supposed to do expires, and ask the court for more time. He should tell the court why he needs more time and how much more time he needs. That's it. The court is confident the plaintiff can do this, because he writes clearly and understandably. The court was able to understand the plaintiff's allegations about what happened to him—he provided the who, what, when, where and why of those events so that the court could screen his complaint and determine whether he had stated a claim for which a federal court could grant relief.

The court will direct the defendants to respond to the complaint. Once the defendants have responded, the court will issue a scheduling order giving everyone deadlines for exchanging information about the case. At that point, the plaintiff may ask the defendants to answer his interrogatories (written questions) and to turn over to him any reports, records, documents or videos that he needs to prove his claims. Federal Rules of Civil Procedure 33, 34. A person does not need legal training to ask the other side questions about his case or to ask for documents or evidence that he believes will help him prove it, and the rules require the other side to answer the questions and provide the evidence unless the court says otherwise.

Because the case is in its early stages and because thus far the plaintiff has done well with communicating with the court, the court will deny his motion without prejudice (meaning that he can renew it if things change).

## IV. Conclusion

The court **GRANTS** the plaintiff's motion for leave to proceed without prepaying the filing fee. Dkt. No. 2.

The court **DENIES AS MOOT** the plaintiff's motion to waive the initial

15

partial filing fee. Dkt. No. 11.

The court **DENIES WITHOUT PREJUDICE** the plaintiff's motion to appoint counsel. Dkt. No. 6.

The court **DISMISSES** defendant City of Racine as a defendant.

The court **ORDERS** the clerk of courts to add defendants LPN Nicole, John Doe 1 and John Doe 2 as defendants.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the complaint and this order on defendants Patrick Noonan, C.O. Saulys, C.O., Thompson, C.O. Gibbs, Nurse Amanda, Sara Jeggler, LPN Nicole, Deputy Burtardt and C.O. Knegt under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** defendants Noonan, Saulys, Thompson, Gibbs, Nurse Amanda, Jeggler, LPN Nicole, Burtardt and Knegt to file a responsive pleading to the complaint.

The court **ORDERS** that the parties may not conduct discovery until after the court enters a scheduling order setting deadlines for completing discovery and filing dispositive motions. After the court enters the scheduling order the plaintiff may make discovery requests on the named defendants to try to identify the real names of John Doe 1 and John Doe 2. Once the plaintiff

16

knows the real names of the John Doe defendants, he must file a motion asking the court to replace the real names for the John Doe placeholders. Again, however, the plaintiff should not serve any discovery requests upon the named defendants until after the court enters a scheduling order.

The court will issue a separate order **REFERRING** this case to Magistrate Judge William E. Duffin for pretrial proceedings.

The court **ORDERS** that the plaintiff must submit all correspondence and case filings to the following address:

>Office of the Clerk
>United States District Court
>Eastern District of Wisconsin
>362 United States Courthouse
>517 E. Wisconsin Avenue
>Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. Failure to do so could result in orders or other information not being timely delivered, which could affect the legal rights of the parties.

Dated in Milwaukee, Wisconsin this 9th day of September, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**

17